Vicksburg Waterworks Company v. Yazoo & Mississippi Valley Railroad Company.

[51 South. 915.]

1. Contracts. *Acceptance. Waterworks. Water supply. Railroads.*

Where five days before the expiration of a contract between a waterworks company and a railroad company, the waterworks company wrote the railroad company that it would not furnish water at the contract price after the expiration of the contract, to which no reply was made; and two days after the expiration of the contract, the waterworks company wrote again stating that it had, upon the expiration of the contract, begun charging the railroad company for water at an advanced rate; and eight days after the receipt of the last letter the railroad company responded, refusing to make a new contract, but paid the higher rate for water received after the expiration of the contract, the transaction did not amount to a renewal of the former contract at the advanced rates, especially since the water company was a public service corporation and bound under its charter to furnish water to the railroad company when properly compensated.

2. Municipalities. *Waterworks. Exclusive franchise. Effect.*

That a municipality had granted to a waterworks company the exclusive right to conduct a waterworks plant will not preclude it from permitting a railroad company to lay pipes in its streets so as to obtain water for the company's own consumption from another source.

From the chancery court of Warren county.

Hon. James Stowers Hicks, Chancellor.

The waterworks company, appellant, was complainant in the court below; the railroad company, appellee, was defendant there. From a decree dissolving a preliminary injunction and sustaining a demurrer to the bill of complaint the complainant appealed to the supreme court.

The object of the suit was to prevent, by prohibitory injunc-

tion, the railroad company from laying pipes in the streets of Vicksburg, under a permit from the city, for the purpose of obtaining water for its own uses from a source other than the waterworks company's supply, and to compel, by mandatory injunction, the railroad company to accept, use and pay for water from the waterworks company. The facts are stated in the opinion of the court.

*Bryson & Dabney,* for appellant.

It is admitted by the demurrer that the appellee verbally invited appellant to submit to it a bid for furnishing all the water for the use of its shops for a period of five years from February 15, 1909, and that in response to that invitation appellant did submit an offer, in writing, of one cent per one hundred gallons, and that the appellee without replying to the offer in any way, either to accept or reject it, went ahead and took the water for a number of days.

The legal effect of this conduct was to create a verbal contract between the parties for the furnishing by appellant and the taking by appellee of water for the period of five years.

Appellee on receipt of appellant's offer, if unwilling to accept its terms was bound to either give notice of its nonacceptance or stop taking water from appellant at or prior to the termination of the then existing contract, and failing to do either it renewed the contract at the new rate specified in appellant's offer.

The taking of the water under the circumstances is inconsistent with any legal hypothesis other than appellant's assent to the terms of the offer. That an offer may be accepted by silence and a contract result, all the authorities agree. 9 Cyc. 258–259; Ib. 270–271; *Bruckman v. Hargadine, etc., Co.,* 91 Mo App. 454; *Atchinson, etc., R. Co. v. Miller,* 16 Neb. 661, 21 N. W. 451; *Conklin v. Cabanna,* 9 Mo. App. 579; *Shreveport Traction Co. v. Mulhaupt* (La.), 48 South. 144.

In the case at bar the defendant has not taken all of the com-

modity offered but the offer was entire and an acceptance of a part is necessarily an acceptance of the whole.

Counsel for appellee may contend that the offer as first made was not for any specific time and therefore could be taken advantage of by it for such period as suited its convenience without binding itself for any definite time. To this anticipated argument we reply that if Galvani's request had not been for an offer of ·five years the offer as made in appellant's letter of February 10th would be indefinite as to time. The letter, however, by its terms refers to Galvani's verbal request and states further that appellant had lost on the previous contract. This last reference by implication strongly indicates that the present bid was for a like period of time as the then existing contract. However, all uncertainty, if any, as to time is cured by appellant's letter of Feb. 17th, wherein it is stated that Galvani's request was "for another period of five years" and that the offer as made was "for the next five years." This letter leaves no room for doubt that the railroad company was after that time fully advised that the offer was for five years next following the expiration of the old contract. After the receipt of this letter by appellee it still continued to take and use appellant's water without. protest and without signifying its nonassent to the terms stipulated, for eight days.

On the eighth day after this letter, during which time nothing had been said or written by either party, appellee sent one of its agents, Green, to read the water meter, through which it had been continuously taking water from appellant. This he did in company with an agent of appellant on Feb. 25th and thereupon from their reading there was ·computed not only the quantity of water taken for the entire month but also how much of the same had been taken under the old contract, being up to the 15th of the month, and how much had been taken after the expiration of the old contract, namely, from the 15th to 25th. Thereupon statements of accounts or bills were made up

by appellant covering water used prior to February 15th at the old rate and between that date and the 25th at the new rate, the time the meter was read. After these had been made up the said Green then and there approved them by writing across the face the letters "O. K." "2/25/09" and signing his name "E. A. Green." The account or bill for water taken from Feb. 15th to the 25th had written clearly on its face among other things the following: "This bill is under the new five year contract from 2/15/09," also "2,179,500 gallons at one cent per one hundred gallons $217.95."

In fact all the terms and conditions of the contract as contended for by appellant appear on this bill. While the bill was not made out in Green's handwriting, except the letters "O. K.", and the date "2/25/09" and his signature "E. A. Green", we submit that the legal effect of his O. K. and signature was to adopt it for his company, appellee, and make it the act of the company in receipting appellant for the water showing it to have been used.

In *Baker v. Byrne,* 2 Smed. & M. 193, this court said: "A subsequent recognition of an act done by an agent or by any one who assumes to be an agent, is usually as binding on the principal, if made with full knowledge of the act done, as if there had been a previous authority. And the recognition need not be expressed, but may be shown by circumstances."

In *Taylor v. Connor,* 41 Miss. 722, this court said: "A principal may adopt or reject the act of a pretended agent *in toto,* but he cannot separate the act and ratify what is beneficial to himself only and repudiate the remainder."

The supreme court of the United States laid down the same rule in *Gaines v. Miller,* 111 U. S. 395.

All of appellant's letters made it clear that appellee was getting a cut rate offer (at one cent per hundred gallons) as an inducement to procure a long term contract and that no such offer would be made for a short term. By reference to ap-

pellant's franchise it will be seen that appellant had the right to name a price of five cents per hundred gallons.

This right is surrendered in order to close the contract. We quote from its letter of the 27th as follows:

"We always give a lower price where a long time period is entered into; and the long term was a special feature considered in making the price, and it was so understood in this matter by your Mr. Galvani and our Mr. Crumpler in their conversation.

"We also notice that you say, that you are willing to pay one cent per hundred gallons for water you may use, but not for the term of five years. As already stated, the price offered at one cent per hundred gallons was based on a long term contract, five years, and the long term was one of the special features considered in making the offer at that price."

After this letter was in the hands of appellee's general superintendent for ten days the appellee walked up to appellant's cashier and paid the bill at the short rate. Will it now be heard to plead the baby act and say I didn't go to do it? Certainly not before a court of conscience. Having accepted advantage of the reduced rate freely and voluntarily with full knowledge that it was offered solely on condition that if accepted it would be for five years, will appellee now be heard to deny its liability?

It makes no difference what authority was vested in Galvani, or what was vested in Green by the appellee company. It is certain that their acts have been fully and completely ratified by appellee. It is equally certain that appellee's general superintendent had knowledge of the bid they were accepting because he acknowledged receipt of appellant's letters containing the bids.

We submit that there was a bid by appellant and that it was accepted by appellee and that as a sequence there is a contract between the parties.

As to the statute of frauds: Appellant's three letters, the water bill containing Green's O. K., the letter signed by W. S. King, general superintendent, and the draft given in payment of the water bills, all being in writing, and by their terms referring to one another, three of them being signed by agents of appellee, are quite sufficient to take the case out of the statute of frauds. *Blair v. Curtis,* 26 Miss. 309; *Fisher v. Kuhn,* 54 Miss. 480; *McGuire v. Stevens,* 42 Miss. 724.

Was the appellant entitled to relief by injunction? Mr. Pomeroy, in his work on Equity Jurisprudence (par. 1401), lays down two classes of contracts of which courts of equity will decree specific performance. These are as follows:

"1st. Where the subject matter of the contract is of such a special nature, or of such a peculiar value, that the damages, when ascertained according to legal rules, would not be a just and reasonable substitute for or representative of, that subject matter in the hands of the party who is entitled to its benefit; or, in other words, where the damages are inadequate."

"2nd. Where from some special and practical feature or incident of the contract inhering either in its subject matter, in its terms, or in the relations of the parties, it is impossible to arrive at a legal measure of damage at all, or at least with any sufficient degree of certainty so that no real compensation can be obtained by means of an action at law; or, in other words, where damages are impracticable."

The contract in question falls under both of these heads. Supplying water is certainly not an ordinary service such as could be performed by any ordinary party. On the contrary it requires a special plant, extraordinary and peculiar equipment and while it may not be like the service of an actor or actress, or of a painter or of an editor, still it is certainly out of the ordinary, and if the parties were reversed the railroad company becoming the appellant, and the waterworks the appellee, unquestionably an injunction would lie to compel the

water company to carry out its contract because of the peculiar
nature of the service to be rendered.

Speaking further upon the same subject in par. 1402 of
Pomeroy's Equity the author says:

"The jurisdiction does not depend upon the nature of the
contract nor of the subject-matter, but it will be exercised
wherever the legal remedy is inadequate. It has been applied
to a great number of special agreements." See also *Hamilton
v. Hector,* L. R. 6 Ch. 701; *Drury v. Molins,* 6 Ves. 328; *Pratt
v. Brett,* 2 Madd. 62; *Briggs v. Law,* 4 John. Ch. 22; *Marvine
v. Drexel's Ex'rs.,* 68 Pa. St. 362; *Fashion Co. v. Stegall, etc.,
Co.,* 157 N. Y. 60, 43 L. R. A. 854; *Joy v. St. Louis,* 138
U. S. 1, 34 L. Ed. 843; *Union Pac. Ry. Co. v. Chicago, etc.,
R. Co.,* 163 U. S. 564, 41 L. Ed. 265.

We cite one other case from the supreme court of the United
States. *Vicksburg v. Vicksburg Waterworks Co.,* 185 U. S.
65, 202 U. S. 435. One of the issues in this case was whether
or not the court would enforce the specific performance of a
thirty-year contract which still had fifteen years to run. Like
the case at bar it was a contract to take water, the only difference
being that in that case it was the city of Vicksburg which had
agreed to take the water while in the case at bar it is the Yazoo &
Mississippi Valley Railroad Company. Upon the right to
injunction the court said:

"We find no error in the decree of the circuit court enforc-
ing the contract rights of the complainant and enjoining the
city from erecting its own works during the time of the con-
tract."

This case is so nearly identical with the one at bar that we
feel it would be idle to add further authority.

We come now to consider the rights of appellant which
pertain to and grow out of the exclusive feature of its con-
tract with the city of Vicksburg.

It will not be denied that this franchise is by its terms ex-

clusive and that if it be valid and enforceable no one other than Samuel R. Bullock and his successors has any right to use the streets of the city of Vicksburg for the purpose of constructing or operating waterworks.

Appellee's answer admits the contract but denies the validity of the exclusive provision and further denies that the exclusive provision has been adjudicated favorably to appellant.

The contract has been three times before the supreme court of the United States for construction but the last time was upon provisions not necessary to be considered here.

The first opinion is found in *Vicksburg Waterworks Co. v. Vicksburg,* 185 U. S. 65, 46 L. Ed. 808. The statement of facts sets out the Bullock franchise above quoted in full and then in commenting on it the court says: "It cannot be seriously contended that  *  *  *  no contract was entered into."

Further commenting the court says on the subject: "The subject matter of the contract was within the powers of the city to make; the terms were explicitly set forth in the ordinance; the works erected were approved by the city, and the respective obligations created by the contract were duly complied with without question or complaint for a period of fourteen years."

The next opinion rendered in the same case on a second appeal (reported in 202 U. S. 453, 50 L. Ed. 1102) affirms a decree rendered by the court below which among other things provided as follows: "Second. That the said ordinance, contract, and franchise be and is hereby declared and held to be in all and every respect legal, valid, and enforceable and binding."

The opinion by Justice Day states that "Section I of the ordinance provided, that, in consideration of the public benefit to be derived therefrom, the exclusive right and privilege was granted for the period of thirty years from the time the ordinance took affect."

The comment generally in this opinion is confined in its ap-

plication of the exclusive provision, to the city.   It was recognized at that time that the only threatened competitor was the city.

We submit, however, that the legal effect of the decision of the supreme court in affirming a decree of the court below which declared and held the whole contract, including the exclusive provision, valid and binding, was an adjudication by the United States supreme court that the said exclusive provision was enforceable.

If the franchise is exclusive, of course, appellant was entitled to the injunction as prayed for and preliminarily granted.

*Mayes & Longstreet,* for appellee.

In the bill of complaint, the Vicksburg Waterworks Company urged, apparently as its strongest equity, its rights, privileges and immunities under the Bullock contract or franchise. It is contended that under this contract the Vicksburg Waterworks Company possessed the absolute and exclusive right to operate waterworks of any kind in the city of Vicksburg, and actually has gone to the length of denying the right of an individual citizen or corporation to provide itself with water from its own source of supply, or by its own private system.

It is fortunate to a consideration of the question that the contract in some of its features has been interpreted by the supreme court of the United States.

In the first case, *Vicksburg v. Waterworks Co.,* 202 U. S. 453, 50, L. Ed. 1102, the question of the right of the city to preclude itself from building and operating a rival waterworks plant, was held to be legally possible.   In that case the supreme court of the United States was careful to confine its interpretation of the Bullock contract, or the alleged franchise, to this particular and narrow limit.   In other words, on the bottom of page 1110, of the opinion, it is said by the court:

"The question is now, not whether the city might make a

contract giving the exclusive right as against all third persons to erect a system of waterworks, but whether it can, in exercising this legislative power, exclude itself from constructing and operating waterworks for the period of years covered by the contract."

So this honorable court will perceive that this was the sole question passed on by the supreme court of the United States, and it is emphasized throughout that in the establishment of an expensive waterworks plant which will require long years of operation, the city would agree for itself not to enter into competition for a definite period, by constructing, owning, and operating a system for itself.

As a matter of fact the interpretation of this contract in this respect has not been before this honorable court, and even the question of whether or not the city could preclude itself, is one of first impression here. The trend of Mississippi authorities is to discourage such grants, and in some of the cases it has been practically asserted that unless the power to grant such exclusive privileges and make such binding contracts, was expressly conferred by charter provisions of the city or by legislative act, that such vesting of exclusive privileges was beyond the power of the city. It has been conceded throughout, that the charter of the city of Vicksburg contained no such provision.

Of course, as the supreme court of the United States has expressly interpreted the Bullock contract, that ruling would be strongly persuasive on this honorable court, but it would not be absolutely binding or conclusive.

In the case just cited, the federal questions were involved and the equity of the bill was a violation of contract rights which should be protected under the federal constitution.

The supreme court, says: "But were the doctrine of Mississippi otherwise, and with the due respect to which the decisions of its highest court are justly entitled, it has frequently held in

passing upon a question of contract, in instances such as exist in this case, involving the constitutional protection afforded by the Constitution of the United States, this court determines the nature and character of itself."

Therefore, in considering the power of the city of Vicksburg, in the first instance, to grant exclusive privileges to maintain and operate public waterworks system, this honorable court in determining such question, in so far as the laws and constitution of the state of Mississippi are concerned, will feel free to pass upon the question as one of first impression. It is a matter of grave doubt whether the city possessed such right.

We beg to call the special attention of the court to the fact that in the case in the United States supreme court, Mr. Justice Harlan delivered a brief but cogent dissenting opinion in which he differed with the conclusions reached by the majority of the court, and held that:

"The city of Vicksburg had no authority under the constitution and laws of Mississippi, to give exclusive right to any person or corporation to maintain a system of waterworks for the benefit of that city and its people."

Therefore, we contend that the city of Vicksburg was not authorized to create a monopoly or to confer special privileges of any kind. *Wright v. Nagle,* 101 U. S. 791; *Ruggles v. Illinois,* 108 U. S. 536; *Knoxville Water Co. v. Knoxville,* 200 U. S. 22; *Collins v. Sherman,* 31 Miss. 335; *Goines v. Coats,* 51 Miss. 335; *Greenville Waterworks Co. v. Greenville,* 7 South. 409.

The second case in which the rights and privileges of the waterworks company were considered in the supreme court of the United States is *Mayor and Aldermen of the City of Vicksburg v. Vicksburg Waterworks Company,* 206 U. S. 496, 51 L. Ed. 1155.

This case came up on a question of right to make a contract for water rates and the validity of such contracts was sus-

tained.   This honorable court has practically held the same.
*Light & Water Co. v. City of Jackson,* 73 Miss. 590.

But even in this latter case, the supreme court held that
such water rates were liable to regulation in so far as they ap-
pled to private consumers, and if there was fraud, oppression
or extortion, the law would absolve the city from such contract
even with respect to the public use. ·

It has been claimed that in our own state the charter and
rights of the waterworks company were adjudicated in the
case of *Griffith v. Vicksburg Waterworks Co.,* 88 Miss. 371,
40 South. 1011.   But a careful reading of the opinion in that
case rendered by MAYES, special Judge, shows that this court
has not interpreted the Bullock contract or the validity of the
charter provisions of the Vicksburg Waterworks Company, nor
approved this franchise granted by the city of Vicksburg.

The sole point adjudicated in the latter case was that where
the city of Vicksburg, by its board of mayor and aldermen
was a party to a valid proceeding in the federal courts in liti-
gations about the same subject matter, involving the same
relief, that a group of private citizens could not, while the
cause was pending on appeal to the supreme court of the United
States, go into the state courts with a bill, in the efforts to have
the same proposition adjudicated.

There is in the opinion an express qualification that in such
litigation, this honorable court would decline to consider the
validity of the grants or the constitutionality of any of the
provisions of the franchise, or of the charter.   Certainly the
case just cited cannot be relied on as an approval by this hon-
orable court of the Bullock contract, or cited in support of the
allegation that the Vicksburg Waterworks Company is pos-
sessed of an exclusive franchise, not only as against the city
of Vicksburg acting as a public municipality by its constituted
authorities, but as against every private citizen.

Whatever may be the holdings of this court on the general ,

proposition, we submit that an inspection of the ordinance itself setting forth the terms of the Bullock contract, construed most favorably to the waterworks company, grants only an exclusive right and privilege to maintain a public waterworks system.

A careful reading of the ordinance would indicate that the main thing granted, or attempted to be granted, was the exclusive right and privilege to maintain a public waterworks system. This idea has been emphasized in all the decisions in the supreme court and in this state.

In none of the decisions of the supreme court, not even in the original case, in 185 U. S. 65, is there any expression which would tend to support the theory that the city of Vicksburg had such power and authority to contract for public utilities that it could grant exclusive privileges which would deny to the individual citizen the right to act for himself and to provide for his private use any water or light accommodation.

The ordinance, by its terms, indicated that the prime object to be attained, was the building and operation of a public waterworks system, and the exclusive privilege is to build and maintain one for the term of twenty years as a public waterworks company, selling its water to the city and to the inhabitants of the city. It is evident that this ordinance did not intend nor attempt to grant the exclusive right to Bullock and his associates to use all the streets and alleys of the city, except in so far as it was necessary to use them in the construction and maintenance of a public waterworks system.

The court will understand that whatever may be said of the validity of the privilege to maintain the public waterworks system, whatever the reasons to support such a contract, these fail entirely, when sought to be applied to the streets and alleys of the city so as to deny to the private citizen the right to reasonable use, that is, in a way which would not interfere with the use by the public waterworks company.

Can a public waterworks company, whose functions and privileges are to supply the community as a whole with water, at agreed prices, or regulated rates, claim that when it had been granted the privilege of using the streets for the laying of its pipes and mains, it obtained such exclusive rights over the streets and alleys, no individual private citizen can use these streets in any wise for the laying of pipes for private supply of water? It is patent that the grant by the ordinance of Vicksburg had in view only a public waterworks system, and the railroad company has in view only a single individual providing water supply for its own use. Under such circumstances, is the citizen to be denied the privilege of crossing any street of the city, in a proper way, with a pipe line, and under such a contract, has the public water works company such an ownership of the water in a community that it can deny to any private citizen the right to establish his own source of supply of water, whether it be from an artesian well or from a natural water course free to the world, or in any other wise?

We deny, first, that it was within the power of the city of Vicksburg to grant exclusive privileges to any public waterworks system which would deny the right of any private corporation or person engaged in the waterworks business as a public business.

Secondly. We deny that the ordinance granted an exclusive right binding on private citizens to the use of the streets of the city for any purpose other than the maintenance of a public waterworks system by the city itself.

Thirdly. We deny that the contract itself evidenced any intention to grant an exclusive right to use the streets and alleys of the city.

Fourthly. We deny that if the grant had been in specific and express terms to use the streets and alleys to the exclusion of the rights of private citizens and private persons, such grant would be valid and constitutional.

Fifthly. Under the *George case,* manuscript opinion, recently decided by this honorable court, it was held that the streets of a municipality belong to the citizens thereof for any private purpose and necessity which do not involve a destruction of the uses of such streets or alleys for public purposes.

Counsel for appellant argue strenuously that even if the Vicksburg Waterworks Company had no exclusive right to the privileges of furnishing water, even for private purposes to the citizens of the city of Vicksburg under the Bullock contract and franchise, at the same time the Yazoo & Mississippi Valley Railroad Company has, by the action of its officers, precluded itself from denying that there was an extension of the original contract with the City Waterworks & Light Company on the basis of the changed figures proposed by the superintendent after the expiration of that contract. But a careful reading of the record, and consideration of the authorities, will convince this court that there can be no substantial controversy on this proposition.

No reasonable man can read the correspondence without perceiving that the whole matter of the contract, the duration of the contract, and price to be paid for the water, were in suspension.

There is a desperate effort to claim that on account of the proposition made to Galvani, the local superintendent, and on account of the mere reading of the meter by E. A. Green, a subordinate employe of the company at Vicksburg, the railroad company is committed to the price and to the time named in the letter of the manager of the Vicksburg Waterworks Company dated the 17th day of February, 1909.

The court will observe that it was only after the contract with the City Waterworks & Light Company was dead and expired, that the manager of the Vicksburg Waterworks Company, by his letter of the 17th of February, 1909, proposed to the local superintendent that all water thereafter furnished

would be furnished under the new proposition of one cent per hundred gallons.

Within a reasonable time after the receipt of this letter and its transmission to the general superintendent, the letter from his office of February 25th was written, and in this letter the authority of any person or of the local superintendent at Vicksburg to bind the company was expressly denied, and there was also notice served on the Vicksburg Waterworks Company that the railroad company would not renew and extend the old contract or make any new contract on the basis indicated in the letter of February 17th.

The letters from the manager of the Vicksburg Waterworks Company may be "smart;" there may be an attempt to conclude the railroad company by some pre-conceived notions of legal charges that might be obtained by the mere fact of the use of water by the railroad company after the reception of a letter from the waterworks company stating the terms, but this court will easily see through this effort.

No subordinate of a company at a local point, merely reading and "OK-ing" the correct reading of a meter can bind the company to the acceptance of all the printed stipulations and conditions set forth in the account.

We have rarely known a more unsubstantial effort to commit a second party to a proposed contract to terms and conditions claimed to have been printed on a submitted statement of account and OK-ed by a subordinate of the company than is evidenced by the proposition in this point.

MAYES, J., delivered the opinion of the court.

The controversy in this case presents an entirely distinct question from any that was involved in the cases of *Vicksburg v. Waterworks Company,* 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, and *City of Vicksburg v. Vicksburg Waterworks Co.,* 206 U. S. 496, 27 Sup. Ct. 762, 51 L. Ed. 1155.

The first contention is that the railroad company has entered into a five-year contract with the waterworks company, dating from the 15th day of February, 1909. The contention does not grow out of any affirmative action on the part of the railroad company; but it is contended that the contract is completed by the failure of the railroad company to reject the proposition made to it by the manager of the waterworks company on the 10th day of February, 1909. This contention, if sound, must rest on the following facts, viz.: On the 10th day of February, 1909, and before the expiration of the first five-year contract, M. O. Crumpler, the manager of the Vicksburg Waterworks Company, wrote to B. F. Galvani, superintendent of the railroad company, stating that he could no longer furnish water at the former rate, that is to say, at six cents per thousand gallons, and that, taking everything into consideration, the water could not be furnished for less than one cent per hundred gallons, or ten cents per thousand gallons. This letter was written five days before the expiration of the first contract. Galvani did not reply to this letter, whereupon, on the 17th of February, Crumpler again wrote, calling Galvani's attention to a conversation they had on the 6th of February in reference to the formation of a new contract, and reminding him of the letter written on the 10th, offering a rate of one cent per hundred gallons, to which there but as yet been no reply; therefore Crumpler said in this letter that at the expiration of the old contract on the 15th of February past, he had commenced to charge the railroad company at the new rate of one cent per hundred gallons, or ten cents per thousand gallons, and that in future the water bill would be rendered at that price. Eight days after the receipt of this second letter, W. S. King, general superintendent of the Yazoo & Mississippi Valley Railroad Company, and residing in Memphis, replied to Crumpler's letter, stating that the railroad company would not agree to pay one cent per hundred

gallons for a period of five years, and further said: "As you seem to assume that we will accept water from you on this basis, I beg to advise you that we, of course, have no idea of making a contract with you on this basis. I note that you had the meter read on the 15th instant, and therefore will com-- mence a charge of one cent per hundred gallons. As our con- tract expired on the 15th, we are willing to pay you one cent per one hundred gallons for such water as may be consumed, but will not agree to·do this for five years, nor for any other specific time." On the 27th of February Mr. Crumpler re- plied to the above letter, in substance saying that they consid- ered the contract for a term of another five years from the expiration of the last five-year contract at the price of one cent per one hundred gallons was a closed incident, and that such would be the contention of the waterworks company, and they would insist upon it being carried out for the full term of five years.

It is contended that because the railroad company did not reply to the proposition made by Crumpler immediately upon receipt of the letter, and because the company received water after that time and paid for it at the price of one cent per one hundred gallons, that this constitutes a binding contract for an- other period of five years. It is contended that the silence of the railroad company after receipt of the proposition for the period of eight days, and the acceptance of water after the ex- piration of the first contract and while this proposition was pend- ing, and payment made for same at the price of one cent per one hundred gallons, renewed the contract; and appellant's counsel cite many authorities to support the proposition that an offer may be accepted by silence, as well as by positive action, so as to constitute a binding contract. The principle of law above cited may and does apply in a proper case; but the facts of this case do not fall within any such rule. The waterworks company is a public service company, under the

·duty by its charter to furnish water to the city and all its inhabitants for public or private use, when properly compensated therefor. The waterworks company had the right to charge reasonable rates for any water furnished to the railroad company; but if the railroad company had declined to enter into a five-year contract to pay one cent per one hundred gallons, which it did do, the waterworks company could not on this account have refused the water supply, but would still have been under the duty to furnish it water at such reasonable rates as were allowable under its charter, for it was its public duty so to do. But, even if this were not true, the proposition was made to the Yazoo & Mississippi Valley Railroad Company on the 10th day of February, five days before the expiration of the old contract, and renewed again on the 17th of February, two days after the expiration of the former contract, and on the 25th of the same month the railroad company wrote rejecting the proposition. If under the facts of this case this public service company could have forced this contract on the railroad company by the mere failure to reject its terms, the railroad company was certainly entitled to a reasonable time in which to consider what it would do. It was utterly beyond the power of the waterworks company to force this contract on the railroad company for a period of five years under the facts of this case, to say the least of it. The waterworks company might possibly have charged a higher price than was proposed, if permissible under its charter and the regulations of the city.

The next contention is that the city is without power to permit the railroad company to use Levee street for the purpose of laying a pipe under it to the end that the railroad company may obtain its own water supply from the Yazoo river, since the city has granted to the waterworks company the exclusive right to conduct a waterworks plant in the city. No question is here involved as to whether or not the city may grant to another individual the right to construct and operate another

waterworks plant in the city of Vicksburg, even though it has already granted this privilege to the present waterworks plant now operating there. The only question now presented is whether or not the city may permit the Yazoo & Mississippi Valley Railroad Company to lay pipes and mains on Levee-street in order to obtain water for itself and for its own consumption from the Yazoo river. It is not suggested that the Yazoo & Mississippi Valley Railroad Company intends to conduct any public waterworks plant in the city of Vicksburg, or that the city authorities have granted or attempted to grant any such authority to it; but the only object is to enable the railroad company to relieve itself from the tax imposed by the waterworks company by constructing its own system, in order that it may obtain its own water supply for its own use. It is not shown that in so doing the action of the railroad company would in any way interfere with the Vicksburg Waterworks Company in the operation of its plant. The only damage done the Vicksburg Waterworks Company is to thus take from it a desirable customer. It would be little less than absurd to hold that the city of Vicksburg was powerless to grant this right to the Yazoo & Mississippi Valley Railroad Company, or to any other person or corporation desiring to supply its own water. A law compelling a holding contrary to this would be little short of tyranny.

The court below having sustained a demurrer to the bill and dissolved the injunction, the *decree is affirmed and cause remanded.*