613 So.2d 864 (1993)
SWEET HOME WATER and Sewer Association
v.
LEXINGTON ESTATES, LTD., a Limited Partnership.
No. 89-CA-1361.
Supreme Court of Mississippi.
February 4, 1993.
*865 Jannie M. Lewis, Lexington, for appellant.
J.R. Gilfoy, Lexington, for appellee.
Michael C. Moore, Atty. Gen., Frank Spencer, Asst. Atty. Gen., Wm. Bruce McKinley, Jackson, for amicus curiae.
Before DAN M. LEE and PRATHER, P.JJ., and PITTMAN, J.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION
This case addresses the issue of how utilities, not subject to the regulation by the Public Service Commission, may classify users and base charges upon the level of usage. This utilities case arose on the appeal of the defendant water district, Sweet Home Water & Sewer Association, from the November 25, 1989 judgment of the Holmes County Circuit Court partially in favor of plaintiff Lexington Estates, Ltd. The utility timely filed a notice of appeal and raises the following issues:
A. Whether Sweet Home Water and Sewer District could legally charge Lexington Estates, Ltd. an impact fee for the use of the water system?
B. Whether Lexington Estates, Ltd. entered into a binding agreement with Sweet Home Water and Sewer District at the time the water district informed Lexington Estates about the impact fee and at the time Lexington Estates began to use the water district's services?
C. Whether Lexington Estates, Ltd. is legally liable for any injuries or damages that it may have caused to the water district by the partnership's failure to have the water district inspect the partnership's connection into the water district?

*866 II. FACTS
The Sweet Home Water and Sewer District (the District) is a public utility created under Miss. Code Ann. § 77-3-3(d)(iv) and with such powers delegated to it by the Legislature. Lepre v. D'Iberville Water and Sewer District, 376 So.2d 191, 194 (Miss. 1979). It is required to serve all residences and businesses within its franchise area, provided it has the capacity. The water system operates according to the rules and regulations set by its commission, of which Arnett Lewis is chairperson. The system has no by-laws. For a customer connected to both water and sewer services, the system charges a $185 connection fee, a $35 charge for a meter deposit, a $25 water inspection fee, and a $25 sewer inspection fee.
Glen Miller, an experienced builder and owner of Glen Miller Construction Co., built a 24-unit apartment complex  known as "Lexington Estates"  to serve residents who are handicapped or who earn less than $17,500 per year. Prior to loan approval, the Farmers' Home Administration (FmHA) required Miller to perform a study to ensure that the water district system would support the building project. Miller contracted with an engineering firm, which performed a study for $6,500.
According to Arnett Lewis, chairperson of the utility, the idea to charge an impact fee arose when Anne King, water district manager, told the board that it could charge an impact fee for a large housing project. The water system had never before charged an impact fee and has not since charged one. Sweet Home admitted that it singled out Lexington Estates to charge a negative impact fee; however, the association never performed a study to determine if Lexington Estates would indeed negatively impact the water system. Arnett Lewis described the only study he could recall:
[A]n impact study ... was generated by ... CDBG, Community Development Block Graph [sic], proposal that we had applied for ... which basically stated that the water system was serving under capacity.
Miller's loan application included as a cost item an "impact fee on the cost approach which is attached to the appraisal for $8,750." The $8,750 item resulted from the Sweet Home's calculation of $350 per meter charged by the water district. In determining the amount to lend Miller, however, the FmHA did not take the cost of the impact fee into account; instead, the FmHA used a market-value appraisal method, and based Miller's loan on the amount his project would bring in the market-place.
Miller obtained a loan from the FmHA on April 21, 1988. Winfred McAdams, the FmHA district manager, assigned John Shell to be the FmHA loan officer monitoring the project. The FmHA did not suggest that an impact fee be charged.
On September 1, 1987, Sweet Home's engineering consultant wrote Miller, saying: "[I]n my opinion, the association will have no problem providing waterworks services for this complex after the new elevated tank project is complete". The next day, the engineering consultant again wrote Miller:
The manager of Sweet Home Water and Sewer District asked me to advise you that the district will charge you the cost of the tie-in and meter installation for your complex plus an impact fee of $350 per unit for each unit in the apartment complex.
If you have any questions regarding this matter or need any additional information, please call Ms. King.
During an April 6, 1988, association meeting, Anne King, the water district manager, told Miller to contact Luke Tate, maintenance operator for the water system, regarding hookup. Miller relied on Tate's ability to represent Sweet Home, since "that is usually the way it is in any town, ... the man over the water and sewer pretty well handles everything."
The minutes of the April 6 meeting state, "The meter cost is $185 per unit, also required along with an impact fee of $350 per unit." The minutes also state that the system possessed the capacity to serve Lexington Estates.
*867 Miller denied that he discussed an impact fee during the April 6 meeting. He explained, "I thought it was the fee for the connect  $350 is what the system had been charging everybody else to connect." Miller had never encountered a request for an impact fee in any of his other building projects. Miller assumed the charge would include the cost of his meters. Miller did not ask for clarification and did not challenge either the impact or connection fees. However, Ted Batson, present at the meeting as attorney for Sweet Home, stated, "I can't assure you [Miller] heard the discussion."
John Shell, the FmHA loan officer who worked directly with Miller, recalled having discussed the impact fee with Miller. He stated that the subject of the fee arose in "several meetings."
Tate of Sweet Home advised Miller that a district water line serving the country club ran across the Lexington Estates site. Miller, knowing that Sweet Home was experiencing negative cash flow and fearing that the approval process might be time-consuming, decided to move the existing lines himself. In August of 1988, he hired Tate independently to move the existing lines at Miller's expense of $2,000.
Miller began construction on his apartment complex in September 1988. He spent $40,000 putting in a water and sewer system for his apartment complex. Sweet Home did not authorize Tate to perform contract work aside from his regular duties, and did not authorize him to connect the project with the district's water main. Miller perceived Tate as having the authority to represent the water district. Sweet Home did not instruct Miller to contact the water district directly and did not discuss the Miller project with Tate. Miller never contacted the district's business office on his own.
Tate assisted in turning on the water at the apartment site, assisting one J.L. Smith in connecting the project to the district's water system. Miller assumed that J.L. Smith would notify Sweet Home of the meter installation. Miller stated that Smith bore the contractual responsibility as a water and sewer contractor to communicate with the water system. Miller knew that Smith was in contact with Tate, who knew of the meter installation. Tate was present when the meters were set and turned on. After Miller connected to the water district lines, several residents moved into the apartment unit of Lexington Estates. Miller admitted at trial that he bore final responsibility for opening up accounts once service to the project began. Tate also "was on the job just about every day," and Miller "assumed that he [Tate] was handling whatever he was supposed to [have] been doing."
On October 14, 1988, the water system terminated Tate's employment. No one from Sweet Home initially notified Miller that Tate did not represent Sweet Home. At the end of November, the system's administrative assistant wrote Miller: "It is unfortunate for your company and the Water and Sewer District that Mr. Tate operated out of the scope of District Policies. All transactions and related business must be channel [sic] through the district office."
Although Miller did not open an account with Sweet Home, the system did bill him for water use because Miller had connected a hose to a district fire hydrant. The association informed him that it could not meter hydrant usage, and Miller paid a flat fee for the use of the water.
The FmHA and Mississippi State Board of Health inspected the water and sewer installation on the site. The health department also inspected the project and sent Sweet Home a copy of the inspection results. At that time, Miller had already covered the sewage piping.
On February 17, 1989, the district wrote Miller and threatened litigation, stating:
After discussion with Attorney Ted Batson and FmHA representative Johnny Shell, it was decided that you made a lawful contract with the Sweet Home Board of Commissioners concerning an Impact Fee of $8,400 (24 units @ $350.00). This fee should have been paid back in October according to information received and documentation on file in our office. We are hoping we want [sic] *868 have to get into litigation in securing these funds.... At this point, it has been decided that no water or sewer services shall be granted until this matter has been resolved.
... .
We will not allow the customers of Sweet Home Water and Sewer District to again bear the cost of trickery and deceit perpertrated [sic] in business dealings.
Shell, of the FmHA, denied ever having told Sweet Home that it was entitled to collect an impact fee from Miller, and agreed that the matter of the fee rested between Miller and Sweet Home. The FmHA did not, itself, require its loan recipients to pay an impact fee. Attorney Batson stated that he had never offered Sweet Home an opinion on the legality of its charging an impact fee, but he had offered his "understanding as a contract."
In April of 1989, Miller completed the Lexington Estates project. Miller did not explicitly inform Sweet Home of the completion, but Miller's construction superintendent encountered a Sweet Home inspector on the site periodically. Sweet Home's inspection policy requires an applicant to obtain a sewer connection permit prior to covering the sewer lines.
On March 27, 1989, Arnett Lewis wrote Miller:
After many attempts by managers to communicate and resolve the matter of the Impact Study Fee's owed to Sweet Home Water and Sewer District by your construction company. The Board of Commissioners has decided to:
1. give you until Friday March 31, 1989 to make payment in full on all fees and interest related to scheduled Impact Study Fees.

2. should you fail to respond the Board of Commissioners will seek legal means to recover said fees and interest.
Miller requested a copy of the impact fee study but did not receive one. He also requested a copy of the Sweet Home bylaws, to see if the association was authorized to charge an impact fee. No one ever informed Miller that his construction had caused a negative impact on the water system. McAdams, the FmHA district director, had not been informed by Sweet Home of any capacity problems. Sweet Home did terminate service, leaving the residents with no source of water or sewer service.
Since the project's completion, the water main connection into the project has broken three times. Miller twice paid for repairs.

III. PROCEDURAL HISTORY
On April 12, 1989, Lexington Estates filed a complaint in the Circuit Court of Holmes County, alleging that the water district arbitrarily cut off water and sewer service. Miller posted bond in the amount of $8,750. Lexington Estates alleged that the water district's demand for an impact fee violated constitutional rights of the partnership and its residents and requested an injunction to restore its service. The court granted a temporary injunction that day.
Sweet Home water district filed a counterclaim, alleging that Lexington owed an impact fee of $350 per unit and a connection fee of $185 per unit. The water district further claimed that Lexington never gave notice to the water district of the construction's completion. Because of the lack of notification, the water district had not inspected the construction and had not received the $1,250 inspection fee. The water district alleged that Lexington had illegally connected into the water system. Sweet Home prayed for a $4,625 connection fee, $8,750 impact fee, $1,250 inspection fee, and fees for water use from connection-time forward.
Before trial, Miller admitted that he had not yet paid for water usage and stated his willingness to pay the metered rate. Sweet Home had not read Lexington's meters because neither Lexington nor Miller had an account with the water system. Arnett Lewis agreed, however, that Miller had paid all bills previously sent to him.
At the end of the non-jury trial, the court issued a partial ruling, ordering Sweet Home to read Lexington's meters and submit *869 a bill for the clerk of the court to pay from the bond posted by Miller.
In the court's written ruling, the court noted that the parties had resolved some fee issues:

 $2,940.00 Residential water/sewer Mar.-Oct. 1989
 495.74 Laundry room water/sewer Mar.-Oct. 1989
 206.14 Tax
 4,625.00 $185 per unit for hook-up
 232.25 Repairs to water line
 + 20.00 Water consumed by Miller's independent bacterial
 inspection.
 _________
 $8,519.13 Total
 =========

The court noted in its ruling that Arnett Lewis, Sweet Home's board chairperson, testified that he knew of no "impact fee." He further testified that the water district did have the capacity to supply Lexington's needs. The court found that Lexington's manager acted in accordance with the instructions of a designated water district representative. The court directed Lexington to pay Sweet Home $8,519.13 for fees and services through October 20, 1989. It directed Sweet Home to provide Lexington with water service on the same basis as other customers. The court directed Sweet Home to pay court costs and declined to award attorneys' fees to either party. Sweet Home appealed the trial court's denial of its right to recover the following fees:

 $ 2,250.00 Inspection fees
 + 8,750.00 Impact fee
 __________
 $11,000.00
 ==========

IV. ANALYSIS

A. Whether Sweet Home Water and Sewer District could legally charge Lexington Estates, Ltd. an impact fee for the use of the water system?
At issue here is whether Sweet Home possessed the statutory authority to charge an impact fee.[1]
*870 A water and sewer district derives its power from the statutory authorization relating to county health, safety, and public welfare:
(c) to make and enter into contracts; ...
(e) to fix, maintain, collect and revise rates and charges for services rendered by or through the facilities of such district, which rates and charges shall not be subject to review or regulation and review by the Mississippi Public Service Commission except in those instances where a city operating similar services would be subject to regulation and review... .
Miss. Code Ann. § 19-5-177 (Supp. 1988); see also Miss. Code Ann. § 19-5-151 (Supp. 1989).
A water and sewer district must obtain revenue from "reasonable rates, fees, tolls or charges for the services, facilities and commodities of its system... ." Miss. Code Ann. § 19-5-195 (Supp. 1988). The revenue should, at a minimum, sufficiently provide for the system's operations and maintenance expenses, bond payments, and reasonable expansion.
In the context of larger utilities, this Court has ruled that the reasonableness of utility rates cannot be measured by "definite rules and legal formulae," but rests on case-specific facts that a judge must consider. State ex. rel Pittman v. Miss. Pub. Serv. Comm'n, 538 So.2d 387, 394 (Miss. 1989).
In this case, the trial court correctly ruled that Sweet Home could not appropriately charge an impact fee to Lexington Estates. While Sweet Home may, under § 19-5-195, assess "rates, fees, tolls, or charges," those assessments must be reasonably calculated to provide for the system's functioning and growth.
Here, Sweet Home offered absolutely no evidence that it reasonably needed to charge Lexington Estates an impact fee. The water district cited only the "fear" that the apartment complex would negatively impact the system's operation. The water district chairperson, Lewis, admitted that the idea arose from the system manager's suggestion that she had charged such a fee in another county. Lewis also admitted that the water district singled out Lexington Estates, and that the district has neither before nor since charged another customer with an impact fee.
In fact, the impact evidence adduced at trial showed that Sweet Home could support Lexington Estates' needs. The study funded by Miller in fulfillment of FmHA requirements demonstrated adequate capacity, as did the September 1, 1987 letter from Sweet Home's own engineering consultant.
Sweet Home cites authority to support the proposition that a utility may legitimately classify users and base charges upon the level of usage. The facts of record demonstrate, however, that Sweet Home offered no reasonable evidence to support putting Lexington Estates in a class by itself and subject to an impact fee.
In the case sub judice, this Court concludes that the trial judge's decision has evidentiary support, and that the judge correctly decided that the impact fee assessed by the District against Lexington Estates was, at the very least, arbitrary on its face and as applied and, at worst, discriminatory. Restated, the evidence shows that the District established all other rates and charges in 1985 and had not changed them until the date of the trial (in 1989). In addition, the minutes of the meeting during which the District established the impact fee reveal that the fee was aimed only at Lexington Estates. The record also reveals that the District established the fee: (1) in the absence of a disparate classification of Lexington Estates as a separate class of customer; (2) in the absence of an explanation of the fee's purpose; and (3) in the absence of identification of any increased costs associated with the service it now provides Lexington Estates. The Court notes that the trial judge *871 concluded that the District has "adequate capacity" to serve Lexington Estates.
Finally, the Court disagrees with the District's contention that it had contracted with Lexington Estates to provide water and sewer services in exchange for an impact fee. This Court supports its conclusion by citing: (1) the lack of a written or oral contract; (2) the lack of a meeting of minds with regard to certain matters such as the nature of the impact fee; and (3) the uncertainty as to whether the District even "has the authority to contract outside of its rates and charges." Id. at 5.
A decision of a circuit judge sitting without jury falls under the manifest error standard of review. Kight v. Sheppard Bldg. Supply, Inc., 537 So.2d 1355, 1358 (Miss. 1989). No manifest error appears in the trial court's ruling, and its decision on this issue should be affirmed.

B. Whether Lexington Estates, Ltd. entered into a binding agreement with Sweet Home Water and Sewer District at the time the water district informed Lexington Estates about the impact fee and at the time Lexington Estates began to use the water district's services?
At issue here is whether, as a matter of fact, Lexington Estates knew Sweet Home intended to charge an impact fee and whether, as a matter of law, Lexington's subsequent use of the system constituted a binding contract to pay the fee. First, as discussed above, Sweet Home lacked the statutory authority to charge an impact fee without some basis of reasonableness. Thus, the water district violated public policy. See First National Bank of Vicksburg v. Carruthers, 443 So.2d 861, 865 n. 3 (Miss. 1983).
Second, Sweet Home's attempt to construe Lexington Estates' use of water as a contract fails. Parties form a contract only when the offeree accepts, Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co., 643 F.2d 1185 (5th Cir.1981); Williams v. Favret, 161 F.2d 822 (5th Cir.1947), although the offeree may manifest acceptance by conduct, Misso v. Nat'l Bank of Commerce, Memphis, Tenn., 231 Miss. 249, 255, 95 So.2d 124, 126 (1957). Sweet Home cites Vicksburg Waterworks Co. v. Yazoo and Mississippi Valley R.R. Co., 96 Miss. 807, 51 So. 915 (1910) for the proposition that acceptance of a service offered on particular terms amounts to acceptance of the terms. Sweet Home confuses the appellant's argument in that case with the Court's holding. In fact, the case better supports Lexington Estates:
It is contended that the silence of the railroad company after receipt of the proposition for the period of eight days, and the acceptance of water after the expiration of the first contract and while this proposition was pending, and payment made for same at the [newly proposed price], renewed the contract; and appellant's counsel cite many authorities to support the proposition that an offer may be accepted by silence, as well as by positive action, so as to constitute a binding contract... . [T]he facts of this case do not fall within any such rule. The waterworks company is a public service company, under the duty by its charter to furnish water to the city and all its inhabitants for public or private use, when properly compensated therefor. The waterworks company had the right to charge reasonable rates for any water furnished to the railroad company; but if the railroad company had declined to enter into a five-year contract to pay one cent per one hundred gallons, which it did do, the waterworks company could not on this account have refused the water supply, but would still have been under the duty to furnish it water at such reasonable rates as were allowable under their charter, for it was its public duty so to do.
Thus, the case supports the proposition that acceptance of a utility's services does not signify non-verbal acceptance that binds the offeree to whatever contract terms the utility proposes. In this case, Lexington Estates' use of the water system did not signify its acceptance of a contract term to pay the impact fee.
*872 The findings of a trial judge sitting without jury receive the same deference from this Court as do chancery findings. Kight v. Sheppard Bldg. Supply, Inc., 537 So.2d 1355, 1358 (Miss. 1989). Thus, where the trial court made no specific fact-finding, this Court assumes that the trial court resolved the issue in favor of the prevailing party. See Shearer v. Shearer, 540 So.2d 9, 11 (Miss. 1989). In this case, the trial court made no specific ruling on the issue of contract. Under this Court's standard of review, this Court may assume that the trial court properly found no binding contract for Lexington Estates to pay an impact fee. This issue lacks merit.

C. Whether Lexington Estates, Ltd. is legally liable for any injuries or damages that it may have caused to the water district by the partnership's failure to have the water district inspect the partnership's connection into the water district?
Through this issue, the District is simply requesting $2,250 in inspection fees. The record contains no evidence which would support the District's request; however, an inspection fee of $1,250 is warranted in view of the evidence. This Court therefore agrees that the District is entitled to $1,250 in inspection fees.

V. CONCLUSION
The trial judge's decision to disallow an impact fee is affirmed. An inspection fee in the amount of $1,250 is granted. The appellant and the appellee are charged equally with applicable costs of this appeal.
AFFIRMED AS TO TRIAL JUDGE'S DECISION ON DISALLOWANCE OF IMPACT FEE; REVERSED AND RENDERED AS TO DISALLOWANCE OF INSPECTION FEE IN THE AMOUNT OF $1,250.00 TO SWEET HOME WATER AND SEWER DISTRICT.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.
NOTES
[1] Pursuant to Mississippi Supreme Court Rule 29(a), this Court requested the views of the Attorney General's Office ("State") and the Public Service Commission ("PSC") on the issues presented in this appeal.

The PSC contends that it "does not have jurisdiction and the authority to review [Sweet Home Water and Sewer District's] rates and charges such as the `impact fee' at issue in this case." See PSC's Amicus Curiae Brief at 1. The PSC asserts that the County Board of Supervisors has the authority to review the District's decisionmaking. A party aggrieved by the Board's decision would then appeal to the circuit court and then to this Court. See generally Miss. Code Ann. §§ 19-5-151 to 19-5-181 (Supp. 1992). This three-tiered appeal procedure may need legislative review to in order to provide small utilities users a feasible review of alleged unreasonable rates.
The foregoing notwithstanding, the PSC briefly discussed the way it deals with proposed rates and impact-fee assessments by utility companies which are under its jurisdiction. The PSC refers to impact-fee assessment as "service extension policies." According to the PSC, an impact fee is assessed in order to "avoid having ratepayers bear the burden of the capital cost incurred to serve new ratepayers." See PSC's Amicus Curiae Brief at 2 (citing Rankin Utilities Co. v. Mississippi Public Serv. Comm'n, 585 So.2d 705, 712 (Miss. 1991)).
The PSC evaluates proposed impact-fee assessments on a case-by-case basis to determine their reasonableness. Reasonableness is not determined by any fixed formula; rather, "it is a question of fact requiring the exercise of `sound discretion and independent judgment' in each case." See id. (quoting State v. Mississippi Public Serv. Comm'n, 538 So.2d 367, 372 (Miss. 1989)).
The State expressed its view in two parts. The State agrees that the District has the right to assess impact fees. The District cites Miss. Code Ann. § 19-5-177(c) (1972) as its authority for assessing impact fees. See Appellant's Brief at 6; Appellant's Reply Brief at 1. However, the State cites a different subsection of the statute for the proposition that the District has the authority to assess impact fees. See State's Amicus Curiae Brief at 3 (citing Miss. Code Ann. § 19-5-177(e) (1972)). The State contends, however, that the District's assessment of an impact fee must be "reasonable, informed and non-discriminatory." Id. (emphasis added). In other words, the District must "classify its customers in a reasonable manner and base its rates and charges on various factors such as cost of service, different character of service required to serve the customer, and quantity of utility commodity." Id.