# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-CA-00334-SCT

*JACK EDWARDS AND DOT EDWARDS*

*v.*

*WURSTER OIL CO., INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/01/93 |
| TRIAL JUDGE: | HON. EDWARD G. CORTRIGHT JR. |
| COURT FROM WHICH APPEALED: | LEAKE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JOHN W. CHRISTOPHER |
| ATTORNEY FOR APPELLEE: | KENNETH WATTS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 2/13/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/6/97 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Here we are called upon to determine whether the compliance with the terms of a contract constitutes acceptance of such contract, resulting in the waiver of all claims thereunder. We conclude that the chancellor's finding that plaintiffs' performance under the terms of its contract with Wurster Oil constituted acceptance or ratification of the contract is not manifestly erroneous. We, therefore, affirm.

### I.

¶2. In the fall of 1990, the plaintiffs, Jack and Dot Edwards (hereinafter, the Edwardses), had been engaged in the operation of a convenience store in Walnut Grove, Mississippi, for approximately two years. They had decided to find a supplier for petroleum products in order to sell gasoline at their store. During the latter part of November or early December 1990, Pat Thaggard, a friend of the Edwardses, introduced them to David Knapp, a representative of Wurster Oil Company, which was headquartered in Louisiana, but had been doing business in Mississippi. Knapp met with the Edwardses to survey their property and discuss the possibility of Wurster Oil supplying them with gasoline.

¶3. A couple of days later, Knapp met with the Edwardses again, discussing the process of installing

the equipment necessary to sell the gasoline. Jack and Dot Edwards, as well as their daughter and son-in-law, Sandra and Delbert Lathem, were present during the meeting. Knapp presented the Edwardses with a copy of the Gasoline Sales Lease and the Gasoline Sales Agreement, both of which contained several blank spaces. The Edwardses signed the documents, while David Knapp, Delbert Lathem and Sandra Lathem witnessed them. However, the documents were not signed by any representative of Wurster Oil which would bind Wurster to the contract.

¶4. After the documents were signed by the Edwardses, they were delivered to Jim Thornton, secretary-treasurer and part owner of Wurster Oil Company. After receiving the documents, Thornton visited Walnut Grove to determine whether the Edwardses had an acceptable location which fit the company's criteria. Thornton discussed with the Edwardses and the Lathems the improvements necessary to be made to the land for the sale of gasoline. After meeting with the Edwardses, Thornton decided to approve the contract and notified Petron, Inc. of Alexandria, Louisiana, an oil services construction company, to make the improvements and install the equipment on the Edwardses' property. On January 15, 1991, Petron made an initial bid of $105,238.39.

¶5. The improvements were made and the Edwardses had begun selling Wurster Oil products by February 1991. Under the terms of the Gasoline Sales Agreement, the Edwardses were to be compensated on a split-the-profits basis and receive a commission equal to half of the profits for all gasoline and petroleum products sold by them for Wurster Oil. However, the agreement referenced an Exhibit "B", which states that the Edwardses were to be held responsible for half of the cost of the improvements through the withholding of half of their commission. Thus, they would effectively receive one-fourth of the profits from the sale of the gasoline.

¶6. The major dispute in this case arises from the portion of Exhibit "B" that was left blank when signed by the plaintiffs. The plaintiffs assert that the entire section of the agreement was blank, except for the signature lines. The defendants, however, assert that the entire section was filled in, except for the signatures of the parties and the amount of the cost of the improvements. The final cost of the improvements was $122,913.91 as submitted by Petron to Wurster Oil on April 25, 1991.

¶7. In March of 1991, after receiving two or three commission checks from Wurster Oil, Mrs. Edwards informed Jim Thornton of her dissatisfaction with the amount that they were receiving, after realizing that they were only receiving half of the commission they thought they were due. She also requested a copy of the contract they had signed, a copy of the cost of the installation of the equipment, and a calculation of the deductions that were made from their checks. All were received in the latter part of April, 1991, after Thornton had obtained the total cost from Petron. After Mrs. Edwards initially voiced her dissatisfaction with the deductions from their commission, Jim Thornton discussed the contract with her on several other occasions and offered to allow the Edwardses to pay for the installation of the equipment themselves, at a price of $122,913.91, or find another company which would do so.

¶8. On January 10, 1992, the Edwardses filed suit against Wurster Oil in chancery court, alleging that Exhibit "B" was "hopelessly contradictory" to the terms of the Gasoline Sales Lease and the Gasoline Sales Agreement, and therefore should be declared void. They further requested an accounting for the method used in calculating the per-gallon charge for the gasoline sold by the Edwardses on behalf of Wurster and a judgment against Wurster Oil for all commissions unlawfully withheld by Wurster

Oil, as well as punitive damages, attorney's fees, and costs of court.

¶9. In the disposition of the lawsuit, the Chancellor held that the agreements completed by Wurster Oil "made material additions to the agreements as signed by the Edwardses and constituted a counteroffer." These material additions included the insertion of a detailed description of the equipment to be installed at the bottom of the first page of the Gasoline Sales Lease, the insertion of the date and length of time of the lease, as well as the insertion of the renewal terms of the lease by Wurster Oil. The Chancellor further noted that "[u]pon receiving the final agreements, the Edwardses had the right to reject them or accept them as they were."

¶10. The Chancellor then held:

> [b]y thereafter permitting the defendant to continue to deduct from their share one- half of the cost of the improvements [from May to the time of suit], the Edwardses accepted the counteroffer. . . [T]he actions of the Edwardses have been consistent with their having a subsisting contract with Wurster Oil Company. . . Pertinent in this regard is the fact that the plaintiffs waited until January 10, 1992 (over eight months), after receiving a copy of the contract before filing suit.

The Chancellor also held that the Edwardses were entitled to recover the amounts owed to them as a result of an audit that was to be conducted to determine whether the plaintiffs had been underpaid under the contract. The court denied the plaintiffs' request for attorney's fees and costs of court, and failed to make any finding regarding whether Exhibit "B" existed as the plaintiffs assert at the time they signed it or as the defendants assert.

¶11. The Edwardses appeal to this Court to consider whether the chancellor erred in ruling that they had accepted the counteroffer of Wurster Oil as evidenced by the Gasoline Sales Lease and the Gasoline Sales Agreement.

## II.

¶12. Whether the chancellor properly concluded that the Edwardses made an "offer" to which Wurster Oil replied with a "counteroffer" is of little consequence to the disposition of this case. The relevant issue to be decided by this Court on appeal is whether the chancellor's ultimate conclusion that the Edwardses' conduct after receiving the documents showing all of the terms from Wurster Oil constituted their acceptance of the contract is manifestly erroneous.

¶13. A contract is not formed until an offeree accepts. *Sweet Home Water v. Lexington Estates*, 613 So. 2d 864, 871 (Miss. 1993); *Houston Dairy, Inc. v. John Hancock Mutual Life Insurance Co.*, 643 F.2d 1185 (5th Cir. 1981); *Williams v. Favret*, 161 F.2d 822 (5th Cir. 1947). It is a well-settled principle of law that "acceptance of a contract as binding upon a party may be shown by his actions, and any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it, is as binding on him as had he endorsed his assent in formal writing. . . ." *Fanning v. C.I.T. Corporation*, 187 Miss. 45, 52, 192 So. 41 (1939); *Old Equity Life Insurance Company*, 217 So. 2d 648, 650 (Miss. 1969); *McInnis v. Southeastern Automatic Sprinkler Co.*, 233 So. 2d 219, 222 (Miss. 1970); *Misso v. National Bank of Commerce, Memphis Tennessee*, 231 Miss. 249, 255, 95 So. 2d 124, 126 (1957).

¶14. The decisions rendered by this Court in reference to the ratification of contracts induced by fraud are helpful in deciding the present issue. In **Koenig v. Calcote**, 199 Miss. 435, 25 So. 2d 763 (1946), this Court examined a suit to cancel a mineral deed executed by the Calcotes in favor of E. J. Koenig for an undivided one-half interest in all of the oil, gas and other minerals under land owned by the Calcotes over a period of ten years. The Calcotes alleged that the deed had been procured by fraud.

¶15. The issue presented before the court was whether there was a subsequent ratification of the deed by the Calcotes by their continuing to accept annually one-half of the rental amount provided under the oil and gas lease held by the Sun Oil Company throughout the remainder of the ten year period, after being advised of the import of the mineral deed held by Koenig in a letter from the Sun Oil Company. **Id.** at 453-454. Quoting 12 C. J. S., *Cancellation of Instruments*, § 38, p. 996, this Court held:

> where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; *any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it*, have the effect of an election to affirm.

**Id.** at 454 (emphasis added). Thus, the fact that the Calcotes continued to receive and accept the amount due under the terms of the mineral deed, which they had contested, constituted a ratification of the contract.

¶16. In **Crabb v. Wilkinson**, 202 Miss. 274, 32 So. 2d 356 (1947), this Court confronted a similar circumstance where the appellees executed to the appellants two written instruments, one granting an oil and gas lease on all the lands involved within the lease, and one granting a mineral deed which conveyed to the appellants "an undivided one half interest in and to all the oil, gas, and other minerals in and under" the lands involved in the lease. The appellees filed suit, alleging that the latter document had been executed on the false "pretense that it was merely a copy of the oil and gas lease, and that the copy was desired for appellants' files." **Id.** at 277. After the appellees inquired as to the reason for their receiving only one-half of the rental due on their property, they were shown copies of the agreements which explained that under the mineral deed they were entitled to one-half the annual rent and the appellants were entitled to the other one-half of the annual rent.

¶17. The appellees were then given the choice of refusing the rent, denying the validity of the mineral deed, or accepting the rent, which would have the effect of recognizing the right of the appellants to receive one-half of the rent by virtue of the mineral deed. The appellees chose to accept one-half the rent for the two years that the tender was made; nevertheless, this Court stated that "their action in accepting the $16 on the first rental renewal was all that was necessary to be shown for the reason that an election to affirm once made is there after irrevocable." The Court repeated the rule announced in **Koenig**, and noted that "at the time of their conduct in affirmance, they [the appellees] had before them in written form all facts material to that affirmance." **Id.**

¶18. In a more recent case, **Turner v. Wakefield**, 481 So. 2d 846 (Miss. 1985), this Court again confronted the issue of ratification of contracts which are allegedly based on fraud. The appellee alleged that it had been fraudulently induced into the execution of a promissory note to the appellant.

The appellee, however, continued to make payments on the note for eleven months after being advised of its potential invalidity. This Court stated that "a contract obligation obtained by fraudulent representation is not void, but voidable." *Id.* at 848-849. The Court held that "upon discovery thereof [of fraud], the one defrauded *must act promptly and finally* to repudiate the agreement; however, a continuance to ratify the contract terms constitutes a waiver." *Id.* at 849 (emphasis added). Thus, this Court's holding was in accord with its previous holdings in *Koenig* and *Crabb* that acts recognizing a contract as subsisting constitute acceptance of the terms of that contract. It is noteworthy that in *Turner*, the appellee pleaded financial hardship and ignorance of the law as reasons for his failure to terminate his payment under the note.

¶19. As was alleged in the previous cases, the Edwardses assert that Wurster Oil's actions constituted fraud. The Chancellor, however, had substantial credible evidence to form the conclusion that the plaintiffs demonstrated a "definite and unequivocal course of conduct" which would disclose that they had acceded to the contract with Wurster Oil. The record reveals that upon realization that the Edwardses were being required to pay fifty percent of the installation cost through the deduction of fifty percent of their commission, Mrs. Edwards immediately informed Jim Thornton of her disapproval of the arrangement in March of 1991. Furthermore, she requested a copy of the contract they had signed, a copy of the cost of the installation of the equipment, and a calculation of the deductions that were made from their checks, which were all received in the latter part of April of 1991.

¶20. After Mrs. Edwards voiced her dissatisfaction with the deductions from their commission, Jim Thornton offered to allow the Edwardses to pay for the installation of the equipment themselves at a price of $122,913.91, or they could find a company which would do so. The Edwardses assert that they were not financially able to do this. As in *Turner*, however, financial hardship may not be relied upon to explain the failure to cease compliance with a disputed contract. Thus, the Edwardses had to resort to other methods of obtaining relief.

¶21. Although a section of the Gasoline Sales Agreement provides that "[a]ll gasoline and all sums collected by Dealer [Jack Edwards and Dot Edwards] for gasoline sold hereunder shall be, become and remain the sole and exclusive property of the Owner," the plaintiffs could reasonably have retained portion of the gasoline receipts that they believed they deserved and awaited suit by Wurster Oil. In the alternative, the plaintiffs could also have immediately sought legal representation and asserted a claim against the defendants for their portion of the commission. Instead, they chose to wait eight months before taking action, while continuing to remit the total gasoline receipts and accepting one-half of their commission from Wurster Oil. We conclude that the Chancellor's holding that, by continuing to remit the entire commission and accepting one-half of their commission from Wurster Oil, the Edwardses' accepted and ratified their contract with Wurster Oil, is not manifestly erroneous. As did the appellees in *Crabb*, the Edwardses had before them all facts material to acceptance or ratification at the time of their acceptance or ratification of the contract. They are, therefore, estopped from asserting their claim which arises from a provision within that contract.

¶22. **AFFIRMED.**

**PRATHER AND SULLIVAN, P.JJ., ROBERTS AND SMITH, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITH SEPARATE WRITTEN**

**OPINION JOINED BY PITTMAN AND MILLS, JJ.**


      **McRAE, JUSTICE, DISSENTING:**


¶**23.** I disagree with the majority's conclusion that the Edwards' acceptance of checks from Wurster Oil for eight months after they first challenged the commission agreement, which had been modified without their knowledge or assent, constitutes a ratification of the contract. When Wurster Oil filled in blanks unbeknownst to Edwards, the company had an affirmative duty to tell the Edwards of the changes. The majority penalizes the innocent party and not the wrongdoer. To do otherwise, penalizes the Edwards for making the best of a bad situation while they discussed various remedies with Wurster Oil's representative, Jim Thorton; made the decision to seek legal counsel; and ultimately, while their attorney did the necessary investigation and research before filing suit. Accordingly, I dissent.

¶24. The Edwards signed a contract which, they assert, was left partially blank. Wurster Oil added language which the Edwards were not aware of until after they had received several commission checks and noticed that they were for only half the amount the couple expected to receive. Thus, there was no meeting of the minds on the counteroffer made by Wurster Oil.

¶25. The majority finds that the Edwards did not act quickly enough to protect their rights; that eight months was too long to wait before filing suit. By not acting *immediately*, the majority says, they ratified the agreement. To have repudiated Wurster Oil's counteroffer, the majority concludes that "the plaintiffs could reasonably have retained the amount of the commission they wanted and awaited suit by Wurster Oil" or "could also have immediately sought legal representation and filed suit against the defendants for their portion of the commission." ***Slip op***. at 9.

¶26. The case *sub judice* is distinguishable from ***Turner v. Wakefield***, 481 So. 2d 846 (Miss. 1985), where the appellee continued to meet his obligations under the terms of the contract *after* he was advised of its potential invalidity. We do not know, however, at what point after trying to resolve their differences with Wurster Oil, the Edwards contacted an attorney and were advised of the contract's potential invalidity. Further, we should not fault the Edwards or their attorney for taking the time to research and investigate their claim prior to bringing this suit. For them to have filed suit *immediately* after they saw the contract in April, without first attempting to resolve the situation without litigation or allowing their attorney time to properly investigate the claim would have exposed the attorney to possible sanctions.

¶27. The Edwards' conduct is further distinguishable from those of the complainants in ***Koenig v. Calcote,*** 199 Miss. 435, 25 So. 2d 763 (1946), where this Court found that the Calcotes had ratified the terms of a mineral deed by accepting payments under its terms *for ten years*. Similarly, in ***Crabb v. Wilkinson***, 202 Miss. 274, 32 So. 2d 356 (1947), the acceptance of rent *for two years* under the terms of a mineral deed alleged to be fraudulent was found to constitute ratification of the agreement. As also distinguished from the case *sub judice*, the Court noted in ***Crabb*** that "at the time of their conduct in affirmance, they [the appellees] had before them in written form all facts material to the

affirmance." *Id.* at 278. The Edwards, however, had received two or three checks before they actually saw the modified contract.

¶28. Accordingly, because the Edwards' conduct does not amount to ratification of Wurster Oil's insertion of different contract terms without the knowledge or consent of the Edwards, I dissent.

**PITTMAN AND MILLS, JJ., JOIN THIS OPINION.**